First case this morning is 09-1161 Solvay v. Honeywell. Mr. Herman. Yes. Thank you, Your Honor. May it please the court. 102G2 requires that to invalidate another patent, the invention must be made in this country by another inventor who had not abandoned, suppressed, or concealed it. The district court in this case got it wrong when it ruled on summary judgment that Honeywell could qualify as another inventor. When Honeywell admitted for purposes of its summary judgment motion that it derived the invention from the Russian scientists. Your Honor, I just want to confirm one thing, my understanding. The claims that are impacted by the 102G issue are 1, 5, 7, 10, and 11? That's correct, Your Honor. The other claims 12, 13, etc. aren't tied to that issue? That's correct. So with respect to claim 1 and the dependent claims therein, the statute requires that it's made in this country. The Russian scientists could not qualify under 102G because they didn't do anything in this country. They conceived and reduced to practice the invention in Russia. It's an interesting term, it says make an invention. You would have thought the statute would have said conceive of the invention. Your Honor, it does say make, and the only case I could find that were made, and the only case I could find that touched on that issue was the Apotex case from the Federal Circuit in 2001, which talked about it has to be made in this country. They said in this country doesn't apply to whether it's abandoned, suppressed, or concealed. So you can point to activities outside of the country for that point. You would say you have to invent in this country, in terms of thinking it up. Absolutely. It says made in this country by another inventor. And so made can't qualify, the Russian scientists can't qualify. But suppose that there were co-inventors, one of whom was Russian and one of whom was in the United States. Well, Your Honor, that would be more akin to under 102G1, where someone overseas then transfers something over to the United States, and then 102G1 doesn't- How would it happen under G2? What would be the result? Under G2, if there was a conception in overseas, and then the conception was transferred to someone in the United States, is that your question? No, my question is you have co-inventors. One is a Russian who worked in Russia, one is in the United States. Would the invention have been made in the United States? It could be. I think conception is the touchstone of invention, Your Honor. So if it was shown that the foreign inventor was the one who conceived some of it, but then that the U.S. inventor also conceived some of it, then you could argue that that was made in this country. What's your view? Would it be made in this country under those circumstances? Under those circumstances where there's conception in both the U.S. and the United- Here, conception? Yes, I think that would be. But obviously that's not the facts here. Here, particularly for purposes of the summary judgment motion, Honeywell admitted, conceded that it derived the invention from the Russians. But it was reduced to practice in the United States before Solvey invented it. I don't know why you say it was reduced to practice in the United States, Your Honor. Let me ask you. Well, no, because it was replicated. Reduced to practice implies that the inventor reduces it to practice. The Russian scientists were the inventor. They reduced it to practice in Russia. The only thing Honeywell did in the United States was replicate what the Russians had done. That's not a reduction to practice, Your Honor. So you're saying that both the conception and the reduction to practice occurred in Russia? That's correct. Now, is that based on the- When you say that, Mr. I guess I'm looking at A41 of the appendix. Is that where we- Is that what you base your finding on or your statement that it was reduced to practice in Russia? The Russian engineers working under contract with Honeywell manufactured- Is that- Yes, and Honeywell admitted for purposes of the summary judgment motion that the invention was conceived and reduced to practice in Russia. So the court got it wrong as a matter of law because this art cannot qualify under 102G. The court also, on summary judgment- Why should that be? I guess that's the- There's not a lot of attention paid in the briefs to the policy question of why you should read 102G that way. Why should it be that you disqualify the thing as being anticipatory because it was conceived of in Russia and the conception was communicated to the United States? Why should that result in 102G being inapplicable? Well, first of all, Your Honor, the first rule of statutory construction, as you know, is that you read the statute and if there's no ambiguity, you don't turn to policy. So first, Salve- Let's assume that there's an ambiguity. Okay. Assuming there's an ambiguity, the 102G is an invention statute. It's unique to the United States. We're the only country that's a first to file instead of a first to invent system. And there's a 102G- There's an antipathy towards secret prior art, generally. In other words, if the prior- You have to jump through hoops to want to qualify under 102G. You can't, as what happened here, Honeywell received the quote-unquote invention in July of 1994. They didn't file a patent application on their improvement process until July of 1996. Well, that's a suppression question. Let's put that aside. There may be an issue about suppression. But why is it that the statute would treat differently someone who conceived out of the United States as opposed to someone who received information as to the conception abroad and then knew about the invention and then- Well, I mean, Your Honor, we cited- I'm sorry. I mean, we cited a few cases. One was the odds-on case. Let's not forget cases because I don't think the cases really answer this question. I don't think we've considered- I don't think we've decided this issue yet. Decided the issue as to whether or not- What's the meaning of 102G in this context? Right. So what are the policy considerations as to why we should decide it one way rather than another? Well, because 102G is unique to the United States law and it only benefits people who take advantage of the United States patent system. And so if you don't take advantage of the United States patent system, you're not entitled to rely on 102G in order to validate another inventor. Your Honor, the United States patent law covers United States patents. And so Honeywell's main argument, and it was the same below, was that Solvay wasn't the first to invent it anywhere in the world, so they can't get a patent on it. That's not the law. The law is who's the first to invent and file in the United States. It's a United States statute. So the policy, it does not benefit people that invent overseas and don't do anything in the United States in order to take advantage of what could be their patent rights. One question. At the parties, we have two versions of 102G. There was the earlier version that referred to another. Yes. And then the version, the later version, I guess it says another inventor. Correct. Which one are we dealing with here and does it matter? Well, Your Honor, I certainly think the language matters. Another inventor, I think it was changed in 1999, but the Dow case said that the cases before were still reading another as another inventor. So there is case law which says that that change in the statute didn't change the law. But clearly, if the words another inventor were put in as opposed to another, then we'd have a different, we could have a different situation. But in terms of just strictly going by which one applies, the events here took place prior to 1999. Which statute would control? Oh, I see. Well, no, I think that when the law is being applied right now as to whether or not it would qualify as 102GR. So I think... Oh, okay. So the updated version. Correct. Okay. So with respect to the abandonment, suppression, or concealment, the district court ruled against Solvay on summary judgment, even though Solvay showed that Honeywell had a policy in place at the time of its supposed 706 invention that it would defer patent applications if they could not show that it had a definite commercial value. And the court agreed that there was this policy, but she said the district court found that Solvay did not prove that this was applied to the 706 patent. Honeywell didn't put on any witness explaining the delay. Is that correct? Well, Your Honor, this was on summary judgment. No, no, no. I understand. But there are depositions. Absolutely. The depositions show that they could not... My question is, in the depositions, in the deposition testimony that was submitted on summary judgment, did Honeywell bring forth a witness who testified as to why the delay took place? Honeywell, well, I don't know that they brought forth. We deposed someone, Jay Friedenson, who was the creator of the form, the RAFPAP form, and he discussed the policy. Right. But did he say, did he explain why there was delay with respect to this application? He could not remember. He could not. So there was no witness who testified as to why the delay took place. Correct. But on summary judgment, Your Honor, the inference of what... the fact that the policy was in place... That's a favorable question to you. Oh, thank you. Thank you, Your Honor. So the facts are that in August of 1995, Honeywell didn't think that there was a market for this product. It wasn't until December of 1995 that it began to change its mind. The key point is that Solvay's priority date is October 23rd, 1995. It wasn't until March of 1996 that Honeywell filed or began preparation of filing its patent application. And again, that's the patent application on its improvement invention. It had in its possession the Russian invention that supposedly invalidates the 817 patent as far back as July of 1994. I'd like to quickly turn to the claim construction issue. Claim 12 requires that the unconverted reactants be kept in the reactor. The district court, in our view, in Solvay's view, ignored the specification and found that keep in the reactor means that the reactants can never leave. The only embodiment in the patent, in the 817 patent, shows that there is a device on top of the reactor and the gas stream comes off the top of the reactor and is then condensed and refluxed back into the reactor. That is how the reactants are kept in the reactor. It was error to construe keep in the reactor to exclude the only embodiment of a device that's on top of the reactor in the patent. Basically, I think the main point or the main evidence that Honeywell's position can't be corrected is that they actually changed their position with respect to these two embodiments when they filed their corrected opposition brief. This court, sua sponte, dismissed their cross-appeal and it had nothing to do with claim 12. It had to do with claim 1. And Honeywell changed their position and said, well, maybe there's not really two embodiments. Maybe there's only one, but still keep in is something different than return to. Keep in and return to are synonymous in the patent and the court erred by finding otherwise. With respect to Honeywell's assertions that somehow... I apologize for pulling you back to the 102G issue. I just want to confirm one thing in my mind. There aren't any fact questions on that point. In other words, we can either conclude on the 102G inventorship issue, leaving aside the concealment point, that the judge was right or wrong as a matter of law. Excuse me, on the way she read 102G, right? That's correct, Your Honor. With respect to the law, she got it wrong as a matter of law and that could be reversed. With respect to the abandoned suppression of concealment, again, she got it wrong as a matter of law because all the inferences were resolved against the solver, who was the party opposed and somebody opposed. That's it. If you don't have any further questions, I'll save them for rebuttal. All right. May it please the court, counsel. Good morning. Good morning. I suspect most of the discussion will be about 102G. I want to just clarify one thing with respect to the issue that we just finished with concerning the cross appeal. The no longer existent cross appeal. The no longer existent cross appeal. And the reason we filed it was because there was an incongruity between the invalidity finding and the infringement finding. There was an infringement finding with respect to Claim 6 and an invalidity finding that did not include Claim 6. Because of that, we simply wanted to protect our rights. We're very cognizant of our obligation not to inappropriately file cross appeals. But we accepted the court's ruling on that and we'll deal with Claim 6 later. It's been dismissed without prejudice by the parties after the judgment was entered. So that was the reason for the cross appeal. And as a result of the need to shrink the briefs, we did take some language out of the discussion with respect to keeping the reactor. But we didn't change our position. We were simply taking out duplicative language that talked about what the specifications. Why don't you tell us why 102G should be construed the way you think it should be construed? What's the policy reason as to why Congress would want to treat somebody who received the conception information from abroad the same way as someone who actually received it here? The policy reason is, well, first of all, I don't think Congress did say that we should treat people who conceive abroad the same way we treat people here. But when that conception… Not the people who conceive abroad, but the people in the United States who receive the information. And I think Congress did provide that when the invention is brought to the United States, then that constitutes, under U.S. law, making the invention in the United States. I didn't know that. I disagree with Mr. Herman with respect to the purpose of the law is to encourage people to file patent applications. The purpose of the law is to encourage people to make the inventions available to the public, whether by a patent application or otherwise. What we have here, Your Honor, is exactly what corporations in this world do every day. Honeywell went to the Russian scientists because they had some available capability because of the demise of the Soviet Union and instructed them, we want you to prepare a commercial process for doing this. Here's the instruction. They did it. They reported back to the owner of the invention, Honeywell, what they had done. Honeywell then took other employees in the United States and replicated that information. Would it make a difference whether the Russians were working for Honeywell or not? In this circumstance, I don't think it does. It might make a difference if we were talking about the validity of a patent that was filed in the United States and whether the proper inventors were named. But that's an issue of whether Honeywell got the paperwork right, not an issue of policy. The policy is once that came into the United States, it became an invention in the United States when Honeywell reduced it to practice. Simply the report coming in in July. Was it reduced to practice first in the United States or in Russia? In Russia. But it was also reduced to practice in the United States. And there's precedent in this court, the Holmwood case, the Scott v. Kiyoma case, and the Breuer v. DiMarina's case, all of which say you can have a foreign inventor if that information is brought into the United States and practiced in the United States. And we have here a process, so simply the instructions weren't enough. Well, Scott, though, wasn't the inventor the same in Europe as here? I believe it was. But, again, that's an issue of inventorship. The thing I've been wrestling with is the statute says the invention made by another inventor in the United States. And then I look at the Dow case, and at 267 Fed 1340, it says, we agree with Dow that under the pre-1999 version of the statute, as with the current version, it must be shown that an inventor made the claimed invention to establish a first inventor defense. Then it goes on. Yes. The difficulty I'm having is that what did Honeywell do to come within the language of the statute? And what I read Dow saying is, namely, what did Honeywell do to invent or think up anything or conceive anything here? As I understand it from the undisputed facts, the Russians invented it, and then Honeywell replicated it or put it in operation here. How is there an invention by Honeywell here to come within 102G? Well, not to parse too fine a point, but with respect to Judge Dykes' comment, the inventor is the individual. It's not the company. Although the cases all talk about companies, it's the inventor who's the individual. Now, there were individuals in Russia who conceived it. Based on the assumed facts for purposes of summary judgment, those are going to be the first inventors. That's the facts as assumed for summary judgment. The inventors are in Russia. The inventors are in Russia. Then we bring it to the United States, and other people in the United States, employed by Honeywell also, replicated what the Russians did and then added to it. And then what the plaintiff calls improvement. And the improvement was then perfected in the United States. The 706 application that was filed in July of 96 incorporated both. It disclosed the Russian process, if you will, and disclosed the improved process. Well, what we have to worry about is when we talk about the invention for purposes of 102G, it's the 817 invention, right? It's the 817 invention. And the Russians, it's agreed the Russians invented the 817 invention, right? For purposes of this appeal, that's correct. And when that was replicated in the United States, that constituted a reduction of practice. I disagree with Mr. Herman. The court found that it was a reduction of practice. It clearly was a reduction of practice. It meets all the requirements of reduction of practice. What did anybody do in the United States on the Honeywell side of the case in terms of inventing vis-a-vis the 817 invention? What I mean, thinking it up or conceiving it or anything like that? Well, they obviously looked at the instructions. They perceived that what they did was to create what was described and actually did it. They actually created what was described and then improved upon it. So in terms of was that the first original invention? Those aren't necessary to the Solvay process. In other words, the Solvay process didn't reflect the improvements, right? Correct, Your Honor. And it's not necessary. I was simply trying to be expansive in my answer. However, I agree with you that the first original inventors, based on the facts that are before this court, were the Russian scientists employed by Honeywell to do this. But with respect to 102G, as this court has held, because we're dealing now with priority between Honeywell and Solvay, not among all patents or among all people in the world. There's a Rexham case that I think you cite, which deals with three inventors. And it says the middle inventor, you have A was first, B was second, C was third. There was interference between B and C. Have you been able to find any case where we have a situation that kind of is most closely with this, where we have an inventor in a foreign country and then a different person or entity or whatever picking up the invention in this country from a foreign country and, in your words, replicating it? Sure. The Holmwood case is exactly that. We have a German scientist who invented it and sent it to his corporate fellow employees in the United States. An application was filed later naming, admittedly, the German scientist. Now, if the issue here is did Honeywell name the wrong inventors, that's really not the issue here. That goes to the validity of the 706. So it's not a question of did Honeywell name the right inventors. It's what did Honeywell do? What are the facts of the case? There was conception in Russia, and that conception was duplicated in the United States. I would submit that the conception, for purposes of US law, was duplicated in the United States, as well as a reduction of practice duplicated in the United States. That was disclosed in the 706 application. That's all admitted. Now, with respect to the policy issue, we're not here talking about is Honeywell entitled to a patent on that. What we're looking to is Solvay entitled to a patent on that, because Solvay admits it's not the first inventor. Honeywell was the first to make the invention in the United States, not for purposes of the validity of the patent that was later filed. I just want to make sure I understand. When we say make the invention, it was the first to maybe practice the invention. Well, yes, but that comes down to a question, then, and I admit that this is a question— Because make the invention means think of them, conceive them. Well, and I understand, and I agree with Judge Dyke that in this context, I think this is the first time this court has been asked to address that. I'm not sure you need to in this case. But the question is— How do you— See, I have a bit of a problem with your construction in light of 102A, which hasn't been discussed by the parties. Now, 102A has very interesting language in it, because it says you're not entitled to a patent if the invention was known by others in this country. And that would seem, in a way, to describe what happened here. And yet, 102A, as I understand it, has been construed when it talks about an invention being known by others in this country. It has to be public knowledge, right? Correct. Yes, Your Honor. So, that would seem, in a way, to be contrary to your interpretation of 102G. 102A uses the word known, which is what seems to be the situation here. It was known to the Honeywell people. But known by the Honeywell people isn't enough under 102A. It has to be public knowledge. And if that's the way 102A is interpreted, why would we interpret 102G your way? Do I make myself clear? You make yourself perfectly clear, Your Honor. And I do understand what you're saying, and I agree with you that that is the way 102A has been interpreted. But one suggestion is 102A has been interpreted that way because there is 102G, and 102G has been interpreted with respect to 102G2, and indeed, 102G1. That the inventor there, another inventor, by definition, there has to be more than one inventor in this situation, because otherwise you would never have another inventor. So, in both 102G1 and 102G2 and 1, the issue is between the two parties that you're looking at, which was first? Because as I said in the Rexham case, with respect to, admittedly, it was under 102G1, you had somebody who was not the first original inventor, but it knocked out the third inventor. So the second knocked out the third. Now, the very well might be that the second isn't entitled to a patent vis-a-vis the first, or may not be entitled to a patent at all. But the issue here isn't patentability. The issue here isn't is Honeywell entitled to a patent on what it reduced to practice in April of 95? The issue here is, is Solvay entitled to a patent, given that Honeywell had already done this, and, as the district court found, there was no evidence of abandonment, suppression, and concealment, and did disclose, as Solvay has conceded, that information, that disclosure, to the public in July of 96? So the issue, I don't think, is is Honeywell entitled to a patent? I would agree with you that if we name the wrong inventors, there's an inventorship problem. We can probably fix that. But that's not before this court. I don't understand. I mean, maybe I'm wrong. I don't understand, and correct me if I don't understand Solvay to be arguing whether or not Honeywell is entitled to a patent. It's just, to me, it just comes, I think you're right on that. That's not the issue. Doesn't it just come down to whether Honeywell, and I mean individuals employed by Honeywell, did anything inventive in the United States? That seems to be what the statute requires. Well, Honeywell owned the invention. The fact that the inventors, the first original inventors were Russian scientists, is irrelevant, because this case law that says if it's conceived over the United States, once it's brought into the United States, then it becomes an invention in the United States. It's not an issue of whether, I mean, we say Honeywell. It's whether Honeywell, Russian scientists, or Honeywell, U.S. scientists. Were the people in Russia, were they employed by Honeywell? They were employed by the Russians. They were under contract. They were under contract, and all of their work belonged to Honeywell, and any inventions that they created belonged to Honeywell. So they were, for all intents and purposes, the equivalent of Honeywell employees bound by contract to give their inventions to Honeywell. In fact, they're even closer to the situation that we're talking about, because they were hired specifically to invent this specific thing, and they did. Now, it can't turn on whether we named the right people in the later patent, because we're not even arguing that the claims of that 706… No, I agree with you. So if what we're talking about is Honeywell… What I'm concerned about is whether there was anything invented done in the United States. Well, let me change your hypothetical, Judge, if I might. If we had taken the Russian scientists' work and replicated it in the United States, filed a patent application, and named the Russian scientists, would anybody be suggesting that somehow or another Honeywell, that there was no invention in the United States? It would depend when you did it, I guess. Well, until the patent application was filed? If we took the work that we hired somebody to do in Russia, which happens in corporate America every day, we take the work that somebody outside the United States does, duplicates it in the United States, then discloses it, is there any question that that's an invention made in the United States? Or is it going to be this court's ruling that until you actually disclose it or file a patent application on it, which is 102A, it's not an invention? It's been conceived in the sense that we recognized what we had, and it was reduced to practice in that the process was actually performed exactly as disclosed. And I submit that the policy would be backwards if we said that isn't made in the United States. What you want to do is you want to preference, perhaps, U.S. inventions under U.S. law. But do you really want to take a U.S. company and say you can't bring something in from the U.S.? It would change a lot of law. The Homewood case, the Scott case, all these cases that do exactly that. The conception took place outside the United States, brought into the United States, and this court has held once it's brought into the United States and in the context of a process, it's actually reduced to practice here. That is the invention made in the United States. And what case do you say most strongly says that? Well, it's the Homewood case says that. The Scott versus Koyama case says that. The Breuer, B-R-E-U-E-R, versus DeMarinis case says that. Quite frankly, I submit, in some respects, maybe even the Dow case says that, although obviously the facts are somewhat different there because it was a licensee. What was the Breuer case? Excuse me? Is that in the brief? I believe so, but I can't remember. Okay. No, that's fine. I don't want to tie you up with a citation issue. My time, I think, is up anyway. Oh, yeah. There it is. I see it. Breuer, DeMarinis. Thank you, Your Honor. Your Honor, Homewood and Breuer are not on point at all. Those are 102G1 cases, and 102G1 specifically says made. It doesn't say made in this country. Sir, let me ask you just two questions. Would your case be weaker in this case? First of all, say the Russian scientists who worked at the Institute came over to the United States, and they had been working with the Honeywell people in replicating it. Would that have made a difference? Well, Your Honor, under that scenario, I assume that the Russian scientists actually conceived of it in Russia and then came over and helped. Correct. And then he helped reduce it to practice here because it's his invention. In that case, if he filed a patent application, then it would be totally different. But remember, I mean, Mr. Krupka's boss… I apologize for cutting you off, but time is fleeting. The only other thing I want to ask, would it make it… Here we know that the Russian scientists were working under a contract with Honeywell, correct? Correct. Everyone seems to agree with that. Would it have made a difference if the Russian scientists were in a Honeywell office in Russia? Well, under that scenario… In other words, were Honeywell employees… If they were Honeywell employees, they still would need to be named inventors. As Mr. Krupka admitted, the inventor is to the person, not the company. What does whether they were named as inventors have to do with anything? The question is not whether Honeywell was entitled to a patent. The question is whether there's a problem with your patent. Absolutely, and we don't disagree with that, Your Honor. The point is that there's the Russian invention, as you pointed out, and then there's this improvement invention. If the Russians never filed a patent application or never publicized this at all, then that goes to the second point of abandonment, suppression, and concealment. But for the first point as to made in this country, it still would not be made in this country. And the only cases that Mr. Krupka can point to are under 102G1, which says made as opposed to made in this country. But some of the cases seem to suggest that the concern with 102G about the requirement of being made in the United States is that if all the activities took place abroad and there was no communication of that information in the United States, there wouldn't be some way for somebody in this country to find out about the invention. Whereas that policy consideration seems to be inapplicable if the information is transmitted from the foreign country to the United States. In other words, the information about the invention is nonetheless available in the United States if it's transmitted over here or whether all the work was done in the United States. I think that, Your Honor, goes to whether or not people outside the United States can take advantage of the United States patent system. And 102G1 in those cases say if you send it to someone in the United States, this inventor sends it to someone in the United States, this inventor can then take advantage of the patent system and file a patent application and get that date. But it doesn't say that under 102G2, when you're trying to invalidate a patent, that someone can send it over to somebody else and all of a sudden that becomes the day it was made in this country. There's no support for that.  Thank you, Your Honor.